Cite as 2026 Ark. App. 238

# ARKANSAS COURT OF APPEALS
## DIVISIONS I, II & IV
### No. CR-25-364

| | |
|---|---|
| STEPHANIE BRANCH<br><br><br>APPELLANT<br><br>V.<br><br><br>STATE OF ARKANSAS<br><br>APPELLEE | **Opinion Delivered** April 15, 2026<br><br>APPEAL FROM THE SALINE COUNTY CIRCUIT COURT<br>[NO. 63CR-24-264]<br><br>HONORABLE BRENT DILLON HOUSTON, JUDGE<br><br><br>AFFIRMED |

**WAYMOND M. BROWN, Judge**

Appellant Stephanie Branch appeals from the Saline County Circuit Court's order sentencing her to twenty-four months in the Arkansas Division of Correction. On appeal, Stephanie raises three arguments. First, she argues the circuit court erred in denying her proffered jury instruction on the affirmative defense of involuntary intoxication. Second, she argues that the circuit court erred by prohibiting the witness, April McCain, from providing opinion or inference testimony regarding her concern that Stephanie had been drugged. Last, she argues that the circuit court erred in finding that Ark. R. Evid. 404(b) would permit the introduction of her prior DWI convictions without violating Ark. R. Evid. 403 if she established the affirmative defense of involuntary intoxication. This court does not find Stephanie's arguments persuasive and affirms.

## I. *Facts and Procedural History*

On April 1, 2024, the State filed a criminal information charging Branch with violation of the Omnibus DWI Act 4th offense. Following this, the parties filed several motions in limine and motions to continue had been filed. An order was entered setting the jury trial to be held on March 11, 2024. Before trial, on March 7, 2025, the State filed an amended criminal information adding a charge for refusal to submit to chemical testing.

On March 11, 2025, the jury trial was held. At the trial, the State put on several witnesses: Jack Jiang, the manager of The Mighty Crab; James Branch, Stephanie's ex-husband; and Nicholas Anderson, a detective with the Benton Police Department.

The following facts were established at trial:

On January 23, 2024, Jiang was working at The Mighty Crab in his managerial position, helping as needed. Stephanie came in around 5:00 or 6:00 p.m. and had a seat at the bar. She stayed until about 9:00 or 9:30 p.m. Jiang stated that Branch had two or three drinks, but she did not order any food. He also admitted he was unsure of the alcohol content in her drinks.

Jiang further testified that there was a man sitting next to Stephanie at the bar, who she had told him was making her uncomfortable. However, he had no direct contact with the gentleman. Sometime after this, Stephanie went to the restroom for about thirty minutes, leaving her drink unattended at the bar.

When Stephanie returned from the restroom, she appeared to be intoxicated. According to Jiang, Stephanie tried to leave, and he followed her outside. At one point, he

2

pulled her out of her truck, told her she should eat, and offered her food. However, she disappeared and eventually left. When asked about the man at the bar, Jiang clarified that he did not see the man do anything to Stephanie or her drink. He also stated that he checked the video footage of that night, but the bar's view was blocked, and he could not see the interaction. Because Stephanie mentioned that the man had made her uncomfortable, they made sure he left the parking lot before they allowed her to go to ensure she wasn't being followed. Jiang also testified that, in the past, Stephanie usually had a designated driver when she was drinking.

Next, James Branch testified that Stephanie came to his home after leaving the restaurant. He noticed that she appeared unstable, had difficulty standing, and seemed intoxicated. James Branch said his Ring camera captured the incident, showing Stephanie stumbling, hitting the wreath on his door, ringing the doorbell erratically, and cursing. This footage was admitted into evidence.

He further recalled that Stephanie's behavior at the time seemed unusual. He stated that she smelled of alcohol, and he could tell she was drunk because he was "married to her long enough to know." James Branch admitted that he did not know how much she had to drink that night, but he could "smell it" on her.

The State's final witness, Detective Anderson, testified that on the night of January 23, 2024, around 9:00 p.m., he responded to a call regarding a disturbance involving an intoxicated female. When he arrived, he found Stephanie sitting in the driver's seat of her vehicle, parked four blocks from James's home. Anderson stated that Stephanie initially told

him she was staying with a friend whose home she was parked in front of and that the friend had taken her keys. Anderson later discovered this was untrue because her keys and wallet were attached and located near her center console. He noted that her story changed several times after this.

Anderson recalled that Stephanie appeared to be intoxicated based on her smell, demeanor, and mannerisms. Anderson further testified that when he asked whether she had consumed any alcohol, Stephanie stated she had two tequila shots. Due to unsafe conditions, he did not conduct field sobriety tests but concluded from the circumstances that Stephanie was intoxicated and placed her under arrest. She was transported to the station, and upon arrival, Stephanie refused to submit to chemical testing.

Anderson confirmed that in his report, he noted Stephanie appeared to be under the influence of central nervous system (CNS) depressants, specifically alcohol. On cross-examination, Anderson acknowledged that Rohypnol is also a CNS depressant. Following this testimony, the State rested its case.

At this time, Stephanie moved for directed verdict:

> The testimony of Mr. Jiang, that Ms. Branch only consumed two -- I believe it was between two and three drinks, that was over the span of four hours, Your Honor.
>
> His testimony was that when she left -- returned to go to the bathroom, turned back to come to the bathroom [sic] she was not intoxicated when she left. She was when she came back. The level of intoxication is still up in the air at this point, Your Honor. That's based on the testimony of Detective Anderson. He came upon our client.

I understand, Ms. Branch's refusal to perform BAC but at that time he failed to perform field sobriety. He failed as a DRE to further investigate upon those investigative tools even though he was certified to do so, Your Honor. And even based on his own testimony he has encountered, combative defendants in the past and has taken the next step to secure a search warrant for a blood draw.

Your Honor, he did not take that opportunity at this time and given that, Your Honor, we need to have -- we're left with the question of when only the testimony of two or three drinks in the span of four hours with no blood draw, no BAC and no other intoxicants at this time, that the State has failed to meet its burden of intoxication as required in order for them -- for this to proceed forward to -- for the jury. Based on that, Your Honor, insufficient -- insufficiencies being presented in evidence I would move for a directed verdict.

The State argued that Stephanie was made aware of her rights and did not consent to chemical testing. Thus, the motion should be denied with respect to the chemical-testing argument. Additionally, the State contended that there was evidence Stephanie was driving the vehicle, that she was in control of it, that she drank alcohol by her own admission, and that the court could observe indications of intoxication from the body camera footage. The circuit court denied the motion for a directed verdict.

Following the denial, Stephanie called one witness, April McCain, the bartender at The Mighty Crab. McCain testified that on the night of January 23, 2024, she was working the bar. She stated that Stephanie ordered one shot of Fireball and a sixteen-ounce beer. McCain further testified that she saw a man sitting next to Stephanie, roughly a foot and a half away.

McCain, like Jiang, also acknowledged that Stephanie left and went to the bathroom. She noted that she did not see Stephanie slur or stumble until fifteen to twenty minutes after

5

Stephanie returned from the bathroom. She explained that, in the past, she had seen Stephanie drink more than two drinks without appearing intoxicated.

The State objected to this line of questioning because it called for speculation, stating that when he spoke to the witness, she admitted she had not seen the man put anything in Stephanie's drink. The court allowed the testimony to proceed, limiting it to what McCain saw but prohibiting her from making any accusations as to whether Stephanie's drink had been spiked if she didn't see the man put anything in it. After presentation of this witness, Stephanie rested her case.

The parties gave their closing arguments before turning to jury instructions. Stephanie proffered a jury instruction for the affirmative defense of involuntary intoxication. The State objected to the introduction of this instruction, arguing that Stephanie had not established a foundation for involuntary intoxication since there had been no evidence of a substance or the possibility of a substance being introduced into her drink.

Stephanie argued that pursuant to *Sharp v. State*, 90 Ark. App. 81, 204 S.W.3d 68 (2005), any evidence that supports the existence of a defense is sufficient to warrant submitting the issue to the jury. She further argued that while there was no direct evidence that anyone added something to her drink, at the very least, there was circumstantial evidence.

The circuit court denied the instruction, and the jury found Stephanie guilty of DWI 4th offense and refusal to submit to chemical testing. She was sentenced to twenty-four

months in the Arkansas Division of Correction. The sentencing order was filed on March 13, 2025. This appeal timely followed.

## II. *Law and Analysis*

### A. Involuntary-Intoxication Defense

Stephanie's first argument is that the circuit court erred in denying her proffered jury instruction for the affirmative defense of involuntary intoxication. Specifically, she argues there is circumstantial evidence to support submitting the affirmative defense of involuntary intoxication. To support this argument, Stephanie cites *Sharp*, which held that a defendant is entitled to a jury instruction "if there is any evidence tending to support the existence of the defense."[1]

Arkansas Code Annotated section 5-65-103(a)(1)[2] provides, in pertinent part, that it is unlawful for a person who is intoxicated to operate or be in actual physical control of a motor vehicle. An alcohol-related offense under this section is a strict-liability offense.[3] Intoxication that is not self-induced intoxication is an affirmative defense to a prosecution.[4] Facts in dispute may be proved by circumstantial evidence, and that fact is established by

---

[1] 90 Ark. App. at 97, 204 S.W.3d at 79.

[2] (Repl. 2024).

[3] Ark. Code Ann. § 5-65-103(c).

[4] Ark. Code Ann. § 5-2-207(a) (Repl. 2024).

7

such evidence when its existence can reasonably be inferred from other facts proved in the case.[5]

A circuit court's ruling on whether to submit a jury instruction will not be reversed absent an abuse of discretion.[6] Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration.[7] A party is entitled to a jury instruction when there is some basis in the evidence to support giving the instruction.[8]

Stephanie's reliance on *Sharp* is misplaced because *Sharp* is distinguishable from the case at hand. In *Sharp*, the proffered jury instruction that was denied was use of deadly force in defense of a person.[9] The *Sharp* court found that the denial of this defense was unjustified because the "any" evidence requirement was met. This was because the evidence established that Sharp had just seen the husband knock his wife unconscious, she was aware of the husband's violent history, she had told the husband to leave the house before he became visibly angry, and he "came at" her.[10]

---

[5]*Atkins v. State*, 310 Ark. 295, 302, 836 S.W.2d 367, 371 (1992).

[6]*Doerhoff v. State*, 2023 Ark. 149, at 4, 675 S.W.3d 877, 880.

[7]*Id.* at 4–5, 675 S.W.3d at 880..

[8]*Schnarr v. State*, 2018 Ark. 333, at 3, 561 S.W.3d 308, 311.

[9]*Sharp*, 90 Ark. App. at 90, 204 S.W.3d at 75.

[10]*Id.* at 92, 204 S.W.3d at 76.

In this case, the testimony at trial was that a man sitting next to Stephanie at the bar made her uncomfortable, he was sitting about a foot and a half away, and she left her drink unattended for between fifteen and thirty minutes. Additionally, testimony established that fifteen minutes after returning from the bathroom, she seemed to be more intoxicated. The circuit court considered the defense providently, thoughtfully, and with due consideration, it stated:

> There is nothing I have heard in evidence to suggest that he did anything to ~ to her drink. Nothing. Not even testimony about his hand was near her glass or that he held her glass or anything of that nature. So, I can't ~ I cannot see where involuntary intoxication is a defense in this case.

There was sufficient evidence to support the circuit court's denial of the involuntary-intoxication defense, and this court agrees.

## B. Prohibited Witness Testimony

Next, Stephanie contends that the circuit court erred in prohibiting the witness, April McCain, from giving opinion or inference testimony regarding her concern that Stephanie had been drugged. Specifically, she argues that McCain had a rational basis to express her opinion or concern that Stephanie had been drugged.

Arkansas Rule of Evidence 701, provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are

(1) Rationally based on the perception of the witness; and
(2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.

Generally, circuit courts have broad discretion in deciding evidentiary issues, and their rulings are not reversed on appeal in the absence of an abuse of discretion.[11] Abuse of discretion is a high threshold that requires the circuit court to have acted improvidently, thoughtlessly, or without due consideration.[12] The rules of evidence do not allow the circuit court to draw one inference from another or to indulge presumption upon presumption to establish a fact.[13]

At trial, there was no testimony or evidence offered to show that anyone saw the man sitting next to Stephanie at the bar place anything in her drink. The circuit court reasoned that unless McCain "saw him put something in her drink, then for her, it is pure speculation for her to say that that's what she thought happened."

Permitting McCain to testify she believed the man had drugged Stephanie would require stacking one presumption upon another. The first presumption is that the man placed a substance in Stephanie's drink despite no evidence that he did so. The second presumption is that whatever was allegedly placed in the drink was a drug. There was no evidence to support either presumption; the evidence showed that Stephanie was under the influence of alcohol, specifically by her own admission. Thus, this court agrees with the

---

[11]*Burmingham v. State*, 342 Ark. 95, 107, 27 S.W.3d 351, 358 (2001).

[12]*Mosier v. State*, 2023 Ark. App. 469, at 6.

[13]*Glidewell v. Arkhola Sand & Gravel Co.*, 212 Ark. 838, 844, 208 S.W.2d 4, 8 (1948).

circuit court's decision to prohibit this testimony since nothing shows it was thoughtless or improvident.

C. Admissibility of Prior DWI if Involuntary Intoxication Established

Last, Stephanie argues the circuit court erred in ruling that, if she established her involuntary-intoxication affirmative defense, evidence of her criminal history–specifically, her prior DWI convictions–could be entered during the guilt phase of the trial under Ark. R. Evid. 404(b).

Arkansas Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Circuit judges have broad discretion in deciding evidentiary issues, and their decisions are not reversed absent an abuse of discretion.[14] An appellate court will not reverse a circuit court's evidentiary errors absent a showing of prejudice.[15]

Here, Stephanie did not establish the involuntary-intoxication defense, and evidence of her prior DWI convictions was not introduced during the guilt phase. Accordingly, she

---

[14]*Burmingham*, *supra*.

[15]*Fort v. State*, 2025 Ark. 148, at 4, 720 S.W.3d 246, 247.

11

suffered no prejudice. Absent a showing of prejudice, this court will not address a hypothetical evidentiary issue.[16]

Therefore, we hold that the circuit court did not err in determining that there was insufficient evidence to support an involuntary-intoxication defense or in prohibiting the defense's witness from giving opinion testimony. Because Stephanie suffered no prejudice, this court affirms the circuit court's decision.

Affirmed.

KLAPPENBACH, C.J., and HARRISON, BARRETT, and HIXSON, JJ., agree.

ABRAMSON, VIRDEN, TUCKER, and THYER, JJ., dissent.

**RAYMOND R. ABRAMSON, Judge, dissenting**. The facts, as relevant to this issue, are as follows: On March 11, 2025, a one-day jury trial was held. The State called Jack Jiang, the manager of The Mighty Crab and Branch's boss (Branch works as a waitress at The Mighty Crab); James Branch, Branch's ex-husband; and Detective Nicholas Anderson, the arresting officer. Branch called April McCain, who was tending bar at The Mighty Crab the evening in question. The uncontroverted evidence adduced at trial is that Branch arrived at the bar area of The Mighty Crab between five and six in the evening, while she was off work. All witnesses testified that when Branch arrived, she was not intoxicated. Jiang testified that Branch had absolutely no more than three drinks while there, and McCain testified that

---

[16]*See Ramaker v. State*, 345 Ark. 225, 46 S.W.3d 519 (2001) (holding that an appellate court will not reverse an evidentiary ruling absent a showing of prejudice).

12

Branch had a single shot of Fireball and eight ounces of beer. Branch later informed Detective Anderson that she had consumed two tequila shots. While at the bar area, a man came in and sat right next to Branch despite the bar being otherwise empty. Jiang believed that this man was a friend of Branch's given how close he was to her. Jiang testified that Branch told him that "the gentleman was acting weird and she didn't know him."

At one point, Branch left the bar—and her drink—and went to the restroom. The testimony here varies: Jiang testified that she went to the restroom for about thirty minutes; and McCain testified that she was back in a couple of minutes. Either way, the testimony is that she left her drink unattended during this period. Jiang and McCain both testified that it was only after she left her drink unattended that she began to act as though she were intoxicated. McCain specifically testified that within fifteen minutes of returning to the bar, Branch was slurring her speech and stumbling. Both Jiang and McCain testified that they had seen Branch drink there on prior occasions and that Branch was often less intoxicated even after drinking more than she had on the night in question.

Jiang testified that after Branch returned from the bathroom, they made sure the man left before Branch and that he had left the parking lot. Jiang testified that this was not unusual and that he had to escort guests out on occasion when they made other guests uncomfortable. Both Jiang and McCain testified that they had never seen Branch act in the manner she acted that night. Jiang was concerned enough that he attempted to review the security footage after the fact, but the view on the video did not clearly show the bar area where Branch had been sitting.

After Branch left The Mighty Crab despite Jiang's attempts to get her to stay, she went to her ex-husband's house to speak with her children. While there, she was captured on her ex-husband's Ring camera, and it was played for the jury. James, her ex-husband, testified that he had seen her intoxicated multiple times, and she was intoxicated. James conceded that she was acting unusually, though. Due to how she was acting, the police were called, and Detective Anderson arrived on scene.

Detective Anderson stated that Branch smelled of intoxicants and that she was belligerent and argumentative. Detective Anderson noted that Branch had bloodshot and watery eyes, and she admitted having had two shots of tequila before arriving at her ex-husband's house. Detective Anderson testified that he was previously a drug-recognition expert and was trained in field sobriety standardized testing. He testified that he was unable to complete the sobriety testing, that Branch refused the breath test, and that he did not obtain a blood test because he felt it was not "safe to subject civilians to her demeanor and mannerisms." Despite this, Detective Anderson testified that it was his opinion that Branch was under the influence of a central nervous system (CNS) depressant and that Branch was not on anything other than alcohol. Detective Anderson, however, conceded on cross-examination that Rohypnol is also a CNS depressant and that it causes near-identical symptoms as intoxication caused by alcohol. Finally, Detective Anderson conceded that he could not conclusively state that Branch had no other substances in her system and admitted that Branch had told him that she took a number of prescriptions.

Branch requested that the jury be instructed on her affirmative defense of involuntary intoxication. Her proffered instruction was the model jury instruction, AMI Crim. 2d 605, which reads as follows:

First: That Stephanie Branch was intoxicated at the time of the alleged offense;

Second: That as a result of this intoxication she lacked the capacity to conform her conduct to the requirements of the law or appreciate the criminality of her conduct; and

Third: That the intoxication was not the result of knowingly taking a substance which she knew or ought to have known would cause her to be intoxicated.

Definition

"Intoxication" is a disturbance of a person's mental or physical capabilities as a result of taking alcohol or drugs or other substance into his body.

The circuit court denied Branch's motion, finding that

[w]hat we have as far as evidence as the testimony that I've heard is that there was a weird guy giving creepy vibes. That's it. There is nothing I have heard in evidence to suggest that he did anything to ~ to her drink. Nothing. Not even testimony about his hand was near her glass or that he held her glass or anything of that nature. So I can't ~ I cannot see where involuntary intoxication is a defense in this case. There are no facts that I see that support it, so the instruction is denied. Defense is denied. That's the ruling of the Court.

On appeal, Branch argues that the circuit court erred when it refused to give the jury her proffered instruction. Our case law is clear that a party is entitled to a jury instruction when it is a correct statement of law and when there is *some basis* in the evidence to support giving the instruction. *See, e.g.*, *Boose v. State*, 2017 Ark. App. 302, at 2, 523 S.W.3d 366, 368; *Wright v. State*, 335 Ark. 395, 983 S.W.2d 397 (1998); *Yocum v. State*, 325 Ark. 180, 925

15

S.W.2d 385 (1996); *Mitchell v. State*, 314 Ark. 343, 862 S.W.2d 254 (1993). The issue is not one of sufficiency; the issue is whether the slightest evidence supports the instruction. *West v. State*, 2017 Ark. App. 416, 530 S.W.3d 355. In fact, this court has written that the slightest supporting evidence *requires* submission of an instruction. *Frost v. State*, 2010 Ark. App. 163; *see also Hamilton v. State*, 97 Ark. App. 172, 176, 245 S.W.3d 710, 713 (2006) (holding that "a trial court is *required* to give a jury instruction if there is *some* evidence to support it" (emphasis added)). Failure to provide a jury instruction when there is the "slightest evidence" to support it is an error of law. *See, e.g.*, *Hall v. State*, 286 Ark. 52, 689 S.W.2d 524 (1985); *Dunlap v. State*, 303 Ark. 222, 229, 795 S.W.2d 920, 924 (1990). We are bound by the precedent of our supreme court, and it has held repeatedly that it is reversible error to not give a jury instruction when the slightest evidence supports it. *Goehler v. State*, 2023 Ark. 186, at 10, 678 S.W.3d 745, 752; *Parker v. State*, 2025 Ark. 55, at 6, 709 S.W.3d 807, 812. Furthermore, this court has even held that giving a jury instruction is erroneous only if "reasonable minds will not differ that the evidence does not establish a basis for the jury instruction." *Garrison v. Hodge*, 2018 Ark. App. 556, at 5, 565 S.W.3d 107, 112.

No Arkansas case law requires direct evidence to support giving a jury instruction on an affirmative defense. And this simply makes sense. It is undisputed that the State can convict someone solely on circumstantial evidence. *See, e.g.*, *Tait v. State*, 2026 Ark. 28, at 7; *McKinley v. State*, 2026 Ark. App. 85, at 4, ___ S.W.3d ___, ___ ("The law makes no distinction between circumstantial and direct evidence when reviewing for sufficiency of the evidence."); *Simmons v. State*, 89 Ark. App. 34, 40, 199 S.W.3d 711, 714 (2004). To now

16

require direct evidence would make it more difficult for a defendant *to get a jury instruction* than it is for the State to *convict* the defendant. Even if we stop short of direct evidence and require circumstantial evidence that supports only the affirmative-defense instruction provided, then we are now holding that "slightest evidence" means "evidence sufficient to support a conviction" and that the defendant's burden to get a jury instruction is the same as the burden we place on the State to obtain a conviction. Again, the issue is not one of sufficiency of evidence; rather, the issue is whether the defendant is entitled to a jury instruction. Furthermore, requiring this level of evidentiary support directly cuts against the plain meaning of "slightest evidence."

In *Sharp v. State*, 90 Ark. App. 81, 91, 204 S.W.3d 68, 75 (2005), this court held that the "law is clear that a party is entitled to an instruction on a defense if there is sufficient evidence to raise a question of fact or if there is any supporting evidence for the instruction." The court explained our standard for determining whether there has been an error in refusing to give an instruction as follows:

> Our role is not to weigh the evidence to determine if the justification instruction should have been given. Instead, the standard requires that we limit our consideration to whether there is *any* evidence tending to support the existence of a defense. If there is such evidence, then the justification instruction *must* be submitted to the jury so that it can make the factual determination as to whether the charged conduct was committed in self-defense.

*Id.* (quoting *Humphrey v. State*, 332 Ark. 398, 410, 966 S.W.2d 213, 219 (1998) (emphasis supplied in *Sharp*); s*ee also Teater v. State*, 89 Ark. App. 215, 201 S.W.3d 442 (2005) (reversing circuit court's denial of a jury instruction on the affirmative defense of mental disease or

17

defect when there was conflicting testimony about the question of the defendant's sanity and holding that the question of his mental state at the time of the shooting was a factual question for jury).

The evidence adduced at trial was that Branch arrived at the bar inside The Mighty Crab between five and six in the evening and left between eight and nine in the evening. McCain and Jiang testified that during this period, she had only two drinks, three at most. April McCain, the bartender, testified that Branch had one shot of Fireball and eight ounces of a beer while she was working at the bar. Both McCain and Jiang testified that they had seen Branch drink more on previous occasions and that she appeared to be less intoxicated than when she eventually left The Mighty Crab. Both also testified that they had never seen Branch act in the manner she was acting that night. McCain testified that a "creepy guy" sat next to Branch, despite no one else being at the bar, and would not leave Branch's side. Jiang testified that Branch told him the man was making her uncomfortable. McCain further testified that Branch went to the bathroom and left her drink unattended at the bar and that it was within fifteen minutes of getting back to the bar that Branch began slurring her speech and stumbling. Jiang confirmed this testimony. Jiang made sure the man left the bar before Branch left and was concerned enough to review the video footage of that evening. Even James Branch, who testified that she was intoxicated, noted that she was acting unusually.

On the whole, this is "some" evidence that Branch's drink was tampered with while she was in the bathroom and that she was intoxicated by something other than alcohol that she did not intentionally consume herself. And when there is "some" evidence, the

instruction is "required" to be given. *Frost*, *supra*; *Hamilton*, *supra*. The evidence above at least created a factual question that the jury should have been permitted to resolve.

Whether this evidence is enough to convince a jury is not the question before us now. The answer to that question rests squarely with the trier of fact—the jury. While we will not reverse a circuit court's ruling on whether to submit a jury instruction absent an abuse of discretion, *see Tait*, 2026 Ark. 28, an error of law can, in and of itself, constitute an abuse of discretion. *Strong v. State*, 2021 Ark. App. 142, 620 S.W.3d 199. Once Branch met her burden of demonstrating that the slightest evidence supported her proffered instruction, the circuit court erred as a matter of law in failing to so instruct the jury. This error of law constituted an abuse of discretion and must be reversed. I therefore dissent.

VIRDEN, TUCKER, and THYER, JJ., join.

*Ingle Law Firm*, by: *Matthew R. Ingle*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Christopher R. Warthen*, Ass't Att'y Gen., for appellee.